## THE STATE v. WHITE, Appellant.

### Division Two, June 6, 1905.

1. **CRIMINAL LAW: Sufficiency of Evidence: Province of Jury.**
   The fact that defendant was present at the time of the difficulty and was engaged in a quarrel with the deceased, the ill feeling between the two, the assumption by defendant of a different name, his false and contradictory statements, and his declaration that he would assume the blame and prove self-defense—were sufficient to justify the jury, whose province it is to pass upon the facts, in finding defendant guilty.

2. ———: **Flight: Evidence: Instruction.** The fact that defendant left the scene of the crime and abandoned his usual haunts, and was afterwards located by police officers under an assumed name, warranted the court, in the absence of explanatory facts, in submitting the question of flight to the jury.

3. ———: **Corpus Delicti: How Established.** Where the undisputed testimony shows that deceased came to his death by violence at the hands of some person other than himself, the *corpus delicti* is sufficiently established.

4. ———: **Admissions.** The statement of defendant to an officer
who visited him and other defendants who had been arrested
for the crime, that he "would take the blame and prove self-de-
fense" was properly admitted in evidence as an admission tend-
ing to show that he committed the crime.

Appeal from St. Louis City Circuit Court.—*Hon. Jesse
A. McDonald,* Judge.

AFFIRMED.

*William E. Fish* for appellant.

(1) The *corpus delicti* was not shown. State v.
Dickson, 78 Mo. 438; State v. Jones, 106 Mo. 302; State
v. Ballard, 104 Mo. 634; State v. Shelly, 166 Mo. 616.
(2) There is not a word of evidence that defendant fled
from his place of abode, as the evidence of officer Mc-
Carthy was that he could not find him at his "usual
haunts." (3) The evidence of deputy sheriff Blake
as to a conversation he had with defendant in the cage
wherein Blake stated the defendant said: "I am will-
ing to prove self-defense," or "he said he would prove
self-defense," should have been struck out.

*Herbert S. Hadley,* Attorney-General, and *John
Kennish,* Assistant Attorney-General, for the State.

(1) It cannot fairly be said that the evidence be-
fore the jury did not tend to establish the guilt of the
defendant. "An instruction to the jury to acquit
should only be given where there is no evidence tend-
ing to prove the offense charged." State v. Warner,
74 Mo. 83; State v. Hill, 96 Mo. 357. (2) The evidence
is sufficient to support the verdict. "If there is sub-
stantial evidence tending to show defendant's guilt the
sufficiency of the evidence to support the verdict will
not be considered by the appellate court." State v.
DeWitt, 152 Mo. 76; State v. Williams, 149 Mo. 496.
(3) The evidence fully justified an instruction on the

presumption of guilt arising from flight. Defendant's flight from the scene of the crime, his subsequent concealment from the officers, and his assuming an alias name, were all proper matters of explanation on the part of the defense, but no such explanation was made, and the court correctly instructed the jury on that question of law. State v. Ma Foo, 110 Mo. 7; State v. Fairlamb, 121 Mo. 137; Underhill on Criminal Evidence, sec. 118; Wharton's Criminal Evidence, sec. 750; Hope v. State, 62 Cal. 291.

FOX, J.—At the April term, 1904, of the circuit court of the city of St. Louis, Edward Maher, John B. King, Clemens Schoenhoff, Mike Galvin, and the appellant, Peter White, were jointly indicted for murder in the first degree for the killing of James Nolan at said city on the 13th day of March, 1904. The court having granted a severance, a *nolle prosequi* was entered as to defendants Maher, King, Schoenhoff and Galvin.

On arraignment the defendant pleaded not guilty and the trial occurred on the 27th day of May, 1904, before a jury duly impaneled.

As the validity of the indictment upon which this prosecution is based is not challenged, we can see no necessity for reproducing it.

The difficulty occurred at McAuliffe's saloon on the southwest corner of Thirteenth street and Cass avenue in the city of St. Louis, on the 13th day of March, 1904, and the facts developed upon the trial as detailed by the witnesses were substantially as follows:

Dr. Howard Carter testified that he was connected with the coroner's office in the city of St. Louis as post-mortem physician, and that in his official capacity on the 13th day of March, 1904, he performed a post-mortem examination on the body of a man identified to him as James Nolan; that on examination he found the body of a man about five feet eight or nine inches tall, weighing about one hundred and fifty-five pounds; that

the examination disclosed a small round gun-shot wound just above the collar bone on the right side, close to the hollow of the neck, a little to the right; on opening the body he found that one of the lungs had been perforated and that there was a large amount of blood in the left chest, the left lung having been perforated, and in the tissues of the back found a leaden ball; the ball was about two and a half inches to the left of the spinal column, and just about on a level with the bottom of the shoulder blade, indicating a slight descent from the point of entrance; that death was caused from hemorrhage resulting from the gun-shot wound.

Austin Terrance testified that he was the porter in McAuliffe's saloon, situated on the corner of Thirteenth street and Cass avenue in the city of St. Louis on Sunday, March 13, 1904; that there was a wine room in the rear of the building with three entrances to the saloon, two on the front streets and one in the rear. That he arrived at the saloon on the morning of the difficulty about five minutes after seven; on his arrival he found about ten men standing at the bar, drinking; he knew some of the men in the saloon, among them, Galvin, King, Schoenhoff, Maher, the bartender, Nolan, the deceased, and the defendant, White. Nolan was standing at the end of the bar towards the front, White next to him, Galvin next to White, Schoenhoff next to Galvin, and Maher was behind the bar; that two or three strangers came in after he reached the saloon; that he remained in the saloon doing some work behind the bar about fifteen or twenty minutes, and heard no conversation between the men; he then went into the yard in the rear of the saloon and was there about twenty minutes; he heard no noise in the saloon while in the yard; on entering the saloon he heard the report of a gun and he met Schoenhoff and King going out the back door as he went in; as he entered the saloon he saw three or four men going out the front door, among them, the defendant, White. In the saloon when he

entered were the bartender, Galvin and the deceased; the deceased was leaning against the table; he saw blood on his shirt bosom and on the floor and table; Galvin was standing near the stove and the bartender was at the telephone. After the shooting he left the saloon on an errand and was arrested.

Sergeant of Police Hurst testified that he was notified of the trouble and in company with another officer drove to the saloon of McAuliffe and found the body of a man lying on the floor with a bullet hole in his neck; that in the saloon were Maher and Schoenhoff, and he met Galvin coming out; that he found a revolver behind the bar in a drawer; that he examined the revolver and found it was fully loaded.

Officer Hugh McFarland testified that he had known the defendant for ten or twelve years; that he and Detective McCarthy were assigned to investigate the homicide and began their investigation the day after the difficulty; that they traveled all over St. Louis and East St. Louis in search of the defendant and finally located him in the city hospital on the 29th of April, under the name of Peter Byron. Defendant told them that he was not at the saloon at the time of the killing, but was at Dave Leahy's house on Howard street, just east of Jefferson avenue; he stated that he visited the place as indicated by defendant but found no one living at that place by that name; that he then took the directory and found a man by the name Dave Leahy living on Warren street. That the defendant stated that from the 13th of March to the 29th of April, he was working on a peddling wagon and was also in East St. Louis several times on his wagon. "I asked him where he was at the time Nolan was killed on Thirteenth and Cass avenue. He said he remembered all about it, that he was out at Dave Leahy's house."

Clemens Schoenhoff testified that he was at McAuliffe's saloon on the morning of the 13th of March; that he reached there about half past one and remained un-

til between seven and eight o'clock; that he saw Galvin and Maher in the saloon. The witness stated that the defendant came into the saloon with two other men and in about three minutes Nolan came in; these men were at the bar when Nolan came in and that they had a drink; after that the bartender called him and gave him a drink and he then went out into the yard and remained about fifteen minutes; while out there a fuss started in the saloon, and when he came in Maher was putting Nolan out the front door; that he pushed him pretty near to the door and Nolan refused to go; that he wanted to get at White and said he would kill him before the day was over; that White was trying to keep away from him, trying to get around him; that he heard a shot but did not see the shooting; that he looked up and saw White and these two men running out the front door. He further stated that he saw Nolan fall and that right after the shot was fired he saw Maher; that he did not think Maher had a pistol because he (Maher) had hold of Nolan with both hands; that the bartender told the deceased to get out of there, he did not want any fighting in there on Sunday; that he heard him say, "You fellows will have to get out of there." Maher had hold of Nolan and he was trying to get behind the counter, and that in pushing him out he had to pass by where White was standing; the deceased was wrestling with Maher to get at White, and when he said he would kill White, White replied, "You won't kill me;" Nolan was cursing and using such language as, "You god damn cocksucker son-of-a-bitch," but he did not apply any epithets toward anyone except White. Witness said he did not see a gun there.

Edward Maher testified that he was tending bar in McAuliffe's saloon on the 13th of March; that he went to work about seven o'clock that morning; that he had known deceased about a month and had seen the defendant in the saloon on another occasion; that when he opened up that morning Galvin and Schoenhoff

were in there. That White, Nolan and two other men came in one after the other; the witness stated that they were quarreling when they came in, but he did not know what about; that drinks were ordered, but he did not know by whom, nor which one paid for them, but that there was a dollar lying on the bar, which he took, and after deducting for the drinks, put a dime back on the bar; that there was an argument in front of the bar about money—about drinks, and that he thought Nolan started the argument; that they were talking about getting another round of drinks and about money; the deceased tried to go behind the bar and he caught him and pulled him out, and told him he would have to keep quiet or he would put him out; that Nolan kept hollering and when he had his back turned the shot was fired. When Nolan started behind the bar he said, "You cocksucker, I will kill you before night." When the deceased used this language and started back of the bar he was arguing with White; that White made no reply to Nolan when he said he would kill him before night; that there were four men there and they were all arguing, but the only dispute about the payment of drinks was between the deceased and White; when Nolan started behind the bar he caught him and pushed him three or four feet towards the back and let him go, and that the deceased then walked out into the room where the others were and renewed the quarrel; that about five minutes later he again walked around in front of the bar to stop Nolan from arguing, and that he was standing near the front door when the shot was fired, having walked out from behind the bar and toward Nolan and was facing south and Nolan was facing north; that the shot came from the north, but he didn't know where White was standing when the shot was fired, but immediately after the shooting White and the two other men ran out the front door; that White was standing right in the center between the two doors when he ran out; that just after the shot was fired the

deceased staggered to the table and leaned against it and then fell to the floor. The witness further stated that he did not see a pistol in the hands of anyone in the saloon; that he had a pistol behind the bar in a drawer, which was afterwards taken by the officers when they arrived.

Francis Blake testified that he was a deputy sheriff at the criminal court; that he knew Schoenhoff, Galvin, Maher, King and White, and had known them for years; that when he learned that they had been indicted he visited the boys at the jail and asked them what they were going to do, when White stepped up and said, "I am willing to prove self-defense;" said, "He would prove self-defense," and then stated, "I'll take the blame on myself and prove self-defense."

Mike Galvin testified that he attended a dance on Saturday night, March 12th, and that the next morning he went to McAuliffe's saloon, arriving there between five and six o'clock; that he saw Schoenhoff and Maher and a couple of others there; that he was intoxicated and lay down on two chairs and went to sleep; that a man came in and asked him if he wanted something to drink, and that he said no, and went to sleep again, and that he did not hear anything until he heard a shot fire, which was between seven and eight o'clock; that when he got up he saw Maher and Schoenhoff, and that the deceased was on the table and afterwards fell onto the floor; that he saw blood flowing from his neck; that he did not see Schoenhoff, Maher, King, Nolan or anyone else in the saloon have a gun.

Officer John McCarthy testified that he learned of the homicide about a half hour after it happened; that he had known the defendant for about eighteen years, and that he was detailed to investigate the difficulty; that he began a search for White the day after the shooting; searched his usual haunts through the Fourth District and through East St. Louis and continued this search until they located him in the city hospital on the

29th of April, under the name of Peter Byron. The witness stated that the day the defendant was arrested, in Chief Desmond's office, Chief Kiely told him that he would give him an opportunity to make a statement about the Nolan murder up there, to which White replied, "I don't know anything about it; I wasn't there;" that he asked him where he was, and he told him he was up at Dave Leahy's house, just east of Jefferson avenue on the north side of Howard street; that he was there from seven o'clock Saturday evening before the murder until nine o'clock the next morning, and when asked what he was doing he says, "We were playing cards and drinking beer," mentioning Dave Leahy's name and some other names, and that he made a similiar statement to him and Mr. Hancock. The witness stated that he visited the place as indicated by the defendant but found no such place on that street. On cross-examination the witness stated that he found a man by the name of Dave Leahy three blocks further on the opposite side of the street.

Officer Lawrence Meany testified that he arrested the defendant on High and O'Fallon streets in the city on the 28th of April; that he found him in an intoxicated condition on the sidewalk, with two men holding him up and that he was bleeding in the back of the head; that he called the patrol wagon and he was taken to the dispensary and from there to the city hospital, and that he gave them the name of Peter Byrne.

Officers Dillon and Deterich testified to going to the saloon on the morning of the difficulty and finding Nolan's body on the floor; that his body was taken to the morgue, and searched but no weapons were found upon it.

At the close of the evidence on the part of the State, defendant interposed a demurrer to the evidence in the nature of an instruction directing the jury under the evidence adduced to find a verdict of not guilty. This demurrer was overruled by the court and defend-

ant excepted. No evidence was offered by the defense.

The case was submitted to the jury upon instructions embracing murder in the first and second degrees and proper instructions as to the presumption of innocence, reasonable doubt, etc. The jury returned a verdict finding the defendant guilty of murder in the second degree and assessed his punishment at ten years in the penitentiary. Judgment upon this verdict was accordingly rendered, from which the defendant prosecuted this appeal and the record is now before us for review.

## OPINION.

The errors assigned of which appellant complains, in the brief before us, may be briefly stated thus:

1. That the evidence is insufficient to support the verdict.

2. That the court erroneously submitted the question of flight, there being no substantial evidence on that subject.

3. That the court admitted at the trial of this cause incompetent testimony.

We will consider the complaints of learned counsel for appellant in the order in which they are assigned in the brief.

We are unable to assent to the contention of appellant that the testimony is insufficient to support the verdict. The facts developed at the trial show that James Nolan was killed by a pistol shot wound, and that the principal quarrel and only manifestation of ill feeling at the time of the killing of Nolan was between the defendant and the deceased. While no one testified to seeing the defendant fire the fatal shot, he was there in a quarrel with the deceased, and immediately after the killing the defendant left the saloon and concealed himself from the officials for a number of weeks, and when discovered was going under an assumed name. When asked

about the murder he denied any knowledge of it and stated that he was not present at the time of the killing, but at a different place, playing cards and drinking beer. When inquiry of a number of the defendants was made as to what they were going to do, the defendant stepped up and said he would prove self-defense and then stated, "I'll take the blame on myself and prove self-defense." In the absence of any explanation by testimony, offered by the defendant, we are unwilling to say, with these facts before the jury, that they were not warranted in finding the defendant guilty. The fact of his presence at the time of the fatal difficulty and being engaged in a quarrel with the deceased, the ill feeling manifested between the two, the assumption of a different name, the false and contradictory statements made by the defendant, his readiness to say upon inquiry that he would prove self-defense, tend strongly to convince the human mind that the defendant was guilty of taking the life of Nolan. The jury heard the testimony, had the witnesses before them; there was substantial testimony as to his guilt; it was the special province of the jury to pass on the facts, and having found the defendant guilty, this court would not be warranted in invading their province and retrying the case, upon the disclosures in the record. [State v. DeWitt, 152 Mo. 76; State v. Williams, 149 Mo. 496.]

It is insisted by appellant that the court, by an instruction, erroneously submitted the question of flight to the jury. This insistence is predicated upon the contention that there was no substantial evidence upon that subject which authorized the court to submit it to the jury. The instruction complained of was doubtless predicated upon the testimony of the officers Hugh McFarland and John McCarthy. McFarland testified that he had known the defendant for ten or twelve years; that he and Detective McCarthy were assigned to investigate the homicide, and began their investigation

the day after the difficulty; that they travelled all over St. Louis and East St. Louis in search of the defendant, and finally located him in the city hospital on the 29th of April, under the name of Peter Byron. McCarthy testified that he learned of the homicide about a half hour after it happened; that he had known the defendant for about eighteen years, and that he was detailed to investigate the difficulty; that he began a search for White the day after the shooting; searched his usual haunts through the Fourth District and through East St. Louis and continued this search until they located him in the city hospital on the 29th of April, under the name of Peter Byron. We are of the opinion that this testimony fully warranted the court in submitting the question of flight to the jury. His leaving the scene of the crime, the inability of the officers who had known him for years to locate his whereabouts, and the assuming of a different name, were such circumstances tending to show concealment to avoid arrest as at least to call for some explanation, and in the absence of any explanatory facts authorized the court to submit such circumstances to the jury. [Underhill, Crim. Ev., sec. 118; Wharton's Crim. Ev., sec. 750.]

It is urged by counsel for appellant that the *corpus delicti* was not shown. This contention is without merit. That James Nolan came to his death by violence inflicted by some other person, under the evidence as disclosed by the record in this cause, is beyond dispute. As to defendant's agency in producing such death, we have heretofore recited the facts developed at the trial, and indicated our conclusions in that respect. The absence of any explanation of the circumstances detailed in evidence, tending to show the criminal agency of defendant in producing the death of James Nolan, warranted the court in submitting the case to the jury, and the circumstances in proof furnished full support to that finding.

This brings us to the only remaining contention

urged by appellant as grounds for the reversal of this judgment, that is, that the court improperly admitted the statement of defendant in which he said he would prove self-defense. This statement of defendant was admitted, and properly so, on the ground that it was an admission at least tending to show that he committed the act of shooting the deceased, Nolan. The statement clearly had that tendency, for if the defendant had nothing to do with the killing of Nolan, then there could be no possible necessity for his proving self-defense. Counsel argues that it not being an admission that he took any part in the shooting, therefore it was erroneous and should have been stricken out. It was the act of shooting Nolan that the State sought to fasten upon the defendant, and it certainly will not be seriously contended that the State, in its proof of admissions or statements by the defendant, should be restricted to such admissions only as admit the commission of the act. We think it is clear that not only proof of admissions of the commission of the act, but, as well, any statement or admissions tending to prove its commission, are admissible.

We find in the motion for new trial that appellant assigned as error the failure of the court to instruct on the subject of *alibi;* however, this is not urged in the brief of counsel as any reason for the reversal of the judgment. The defense of an *alibi* was not interposed in this cause, and no testimony was offered by the defendant on that subject. The testimony of the State could not have furnished the basis for an instruction upon the defense of an *alibi,* for the reason that the statement of the defendant made to witnesses, introduced in evidence, that he was not present at the scene of the murder, was for the sole purpose of showing its falsity, and upon the theory that such false statement was a circumstance for the consideration of the jury.

The instructions of the court were a full and fair presentation of the law as applicable to the facts of

this case. The correctness of none of them were challenged in the motion for new trial, except the one as herein indicated. The jury heard the testimony; there is nothing disclosed in the record indicating any passion or prejudice on the part of the jury; hence, we are unable to assign any legal reason for disturbing their verdict.

Finding no reversible error in the record, the judgment should be affirmed, and it is so ordered.

*Gantt, J.*, concurs; *Burgess, P. J.*, absent.